FILED
CLERK

7/6/2023 9:03 am

U.S. DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
LONG ISLAND OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------X
JUAN GARCIA,
       also known as "Cruzito,"

                   Petitioner,

      -against-                            **MEMORANDUM AND ORDER**
                                                  10 CR 471 & 17 CV 7610 (GRB)
UNITED STATES OF AMERICA,

                   Respondent.
----------------------------------------------------------------X

**GARY R. BROWN, United States District Judge:**

       Petitioner Juan Garcia, convicted for his participation in a notorious "brutal execution style murder" of a young mother and her two-year-old son, both of whom he knew and lured to their deaths, files the instant motion pursuant to 28 U.S.C. § 2255, seeking to vacate his life sentence and for resentencing. This matter, initially before then-District Judge Joseph Bianco, has been reassigned to the undersigned for review. Because Garcia raises no meritorious grounds to challenge the sentencing, the petition is DENIED in all respects.

       **Background**

       Juan E. Garcia ("defendant"), proceeding *pro se*, moves to vacate, set aside, or correct his sentence pursuant to 28 U.S.C. § 2255. Docket Entry ("DE") 63. On October 15, 2014, Garcia pled guilty to one count, Murder of Vanessa Argueta in Aid of Racketeering in violation of 18 U.S.C. § 1959(a)(1). DE 26. On November 23, 2015, the Court sentenced Garcia to life imprisonment. DE 49.

       In the petition, Garcia asserts that his counsel provided ineffective assistance by failing to: (1) seek that the defendant be treated as a juvenile or request an adult transfer hearing under the Juvenile Delinquency Act ("JDA"); (2) correctly advise the defendant about consequences of

1

the plea and his sentencing exposure; (3) object to portions of the Pre-Sentence Report ("PSR") and make certain arguments at sentencing; (4) inform the defendant of his rights under the Vienna Convention and/or move to suppress the defendant's confession for an alleged violation of the Vienna Convention; and (5) raise various issues on appeal. *See generally* DE 63-5.

Much of the relevant factual and procedural history of this matter can be found in the Second Circuit's affirmance of petitioner's sentence, which is incorporated herein by reference. *United States v. Garcia*, 666 F. App'x 74, 76-78 (2d Cir. 2016). The following additional facts are adduced from the petition, the government's response, and the underlying record.

On October 15, 2014, Garcia pled guilty, pursuant to a written plea agreement, to one count of murder in aid of racketeering, in violation of 18 U.S.C. § 1959(a)(1) for his role in the murder of Vanessa Argueta. DE 26; DE 71-1 at 33. The plea agreement included, among other things, the statutory term of imprisonment for a violation of 18 U.S.C. § 1959(a)(1), as well as the defendant's estimated guideline range. DE 71-1 at 33-36.

At the outset of the plea hearing, Judge Bianco confirmed that Garcia appeared competent to proceed with the guilty plea. *Id.* at 51:7-10. Garcia acknowledged that he was satisfied with his attorneys' representation. *Id.* at 51:20-22. Garcia was fully informed of the constitutional rights he would forfeit by the entry of a guilty plea. *Id.* at 51:23-57:22. Next, Judge Bianco explained the potential penalties Garcia faced as a result of his guilty plea, most notably that there was "maximum penalty [of] imprisonment for life." *Id.* at 57:23-61:10. In connection with the potential maximum sentence, Judge Bianco advised Garcia as follows:

> Count 2 carries a maximum term of imprisonment of life, there is no minimum term of imprisonment. And it states in your plea agreement normally there would be a mandatory minimum sentence of life in connection with this count. However, the parties agree and I also agree that based upon the Supreme Court decision in the case known as *Miller v. Alabama*, that the Count 2 does not carry a mandatory

2

>   minimum sentence. So your maximum term of imprisonment is life, but there is no mandatory minimum term of imprisonment.

*Id.* at 57:25-58:10. Garcia acknowledged that he understood. *Id.* at 59:2.

Judge Bianco established that Garcia had entered into and understood the consequences of the plea agreement with the government. *Id.* at 61:11-65:5. Garcia acknowledged that he was given the plea agreement in both English and Spanish. *Id.* at 61:19-62:11. Notably, the plea agreement stated that the statutory maximum term of imprisonment was life and the Guidelines estimate (to which the defendant stipulated) "carries a Guidelines sentence of life imprisonment." *Id.* at 33-36.

Garcia then explained his role in the crime, admitting that he was a member of La Mara Salvatrucha, also known as the MS-13 street gang. *Id.* at 65:6-12. He admitted that the MS-13 gang effected foreign and interstate commerce by, among other things, wiring money and interstate travel to conduct gang business. *Id.* at 65:17-21. Garcia admitted to having agreed with other MS-13 members, including Boxer, Gringo, and Zorro, to kill Vanessa Argueta because she had allegedly "disrespected" Garcia and MS-13 by sending rival gang members to attack him. *Id.* at 65:22. Mr. Garcia then explained that he agreed to lure and kill Vanessa Argueta to maintain and increase his position in MS-13. *Id.* at 65:25-66:2.

What happened next, as described by the defendant in sworn testimony at the sentencing hearing, proves chilling:

>   We decided to kill Vanessa on February 4, 2010. When I picked her up in Hempstead, she brought her son Diego Torres with us. I drove to Central Islip and picked up Gringo and then Patchogue and picked up Zorro. I then drove to Brentwood where we picked up a handgun from another MS-13 member named Joker.
>
>   We then drove to a wooded area in Central Islip where Gringo and Zorro had held MS-13 meetings. We walked into the woods and Zorro shot Vanessa in the head. He then handed the gun to me and I shot her in the chest.

3

> The gun jammed, but Gringo took the gun from him, cleared the shell casing and shot Diego in the head.
>
> The first shot didn't kill Diego and the gun jammed again, but Gringo cleared the shell casing and then shot Diego in the head a second time, killing him.
>
> I knew what I was doing was wrong . . . .

*Id.* at 66:3-18. Garcia, at first, suggested he was "threatened" in connection with committing this act, but this threat was articulated as follows:

> He was told that he had to do this in order to prove himself to the gang, the exact words of one of his gang fellows was that he had to get blood on his hands. He was being tested.

*Id*. at 67:23-68:4. Thereafter, the government summarized the proof that would have been presented had the case gone to trial, and Garcia confirmed the government accurately described his behavior. *Id.* at 69:12-70:22.

Garcia and his co-conspirators then arranged to flee from New York to Texas, then Texas to El Salvador. DE 63-5 at 3. They remained in El Salvador for some time, then Garcia fled to Nicaragua, where he remained for an additional four years until surrendering to the FBI. *Id.* at 3-4.

Garcia's sentencing hearing was held on November 23, 2015. DE 49. Judge Bianco addressed objections from counsel to the PSR, including applying no enhancement for obstruction of justice and crediting defendant for acceptance of responsibility. DE 71-1 at 88:4-89:20. Judge Bianco then calculated the applicable Sentencing Guidelines range, as follows:

> [T]he base offense level for the murder of Ms. Argueta is 43. The murder of Diego Torres is 43 plus 2, because he qualifies under the guidelines 3A1.1(b)(1). That's a 45-level for Diego Torres. And then the multi-count adjustment, there is a plus two. That is a total of plus two, which is the highest offense level, which makes it a 47. And then the three-level reduction for timely acceptance of responsibility. It is a total offense level of 44 . . .

4

> [Garcia] is in Criminal History Category 1 which, as the government pointed out, results in an advisory calculation of life.

*Id.* at 91:8-22

Neither side objected to these determinations. *Id.* at 92:7-12. Following argument, Judge Bianco imposed a sentence of life imprisonment. *Id.* at 102:21-23. Judge Bianco explained that, in reaching this sentence, he expressly considered all the factors listed in 18 U.S.C. § 3553(a). *Id.* at 101:17-18. Judge Bianco also considered the *Miller* factors, as well as the defendant's age and characteristics, including any immaturity, impetuosity, or failure to appreciate risk and consequences. *Id.* at 106:11-108:24. The Court found that Garcia showed maturity through years of caring for himself while fleeing and did not act impetuously, as the attack on Ms. Argueta was pre-meditated and planned, rather than extemporaneous. *Id.* at 107:10-25. The Court also noted Garcia's understanding of risks and consequences while being a member and later leaving the MS-13 gang. *Id.* at 107:17-22.

Having carefully considered and weighed all of these factors, Judge Bianco outlined the facts supporting his decision that this case represented one of the rare circumstances warranting the imposition of a term of life on a juvenile defendant, which included the following:

> This involves the brutal execution style murder of a 19-year-old woman, Vanessa Argueta, and her two-year-old son Diego. [T]here is absolutely no question that the defendant played a critical role in this crime. This is not a situation where fellow gang members had some murder they wanted to conduct and sought Mr. Garcia's assistance.
>
> Mr. Garcia is the one [ ] that brought the dispute with Vanessa to the MS-13 gang. He was a member of the gang. He knew what the gang was about. He knew what response the gang would have to such a situation, yet he made the decision to bring it to the gang. And when they determined what would be clear to anyone who knows this violent gang, that she had to be murdered, he agreed to participate in the murder; he agreed to play a pivotal role of luring her out of the house for the murder. [H]e was the only one in the car at that time.

5

>   Once they were in the woods he shot Ms. Argueta in the chest. With respect to Diego, although he did not pull the trigger on the two shots, that was Mr. Guzman. I think it is important to note that even though there was an effort, as [defense counsel] noted, to have the boy left behind, when that was unsuccessful Mr. Garcia could have called off that shooting. He was alone. He could have called back to the gang and made up a million excuses. She wasn't home, she won't come with me. He knew the situation that was about to happen, and yet he decided he wanted Diego there, to bring her to her death with Diego along with her. [A]fter shooting Vanessa in the chest he surrendered the gun to Mr. Guzman who shot the boy.
>
>   I believe that for this brutal crime, a life sentence is necessary to reflect the seriousness of the murders, to provide a just sentence for the loss of two lives in a single act. I believe it is necessary to protect the public from further crimes by the defendant.

*Id.* at 103:9-104:19.

On appeal, the Second Circuit rejected arguments by Garcia that the sentence was substantively unreasonable, noting:

>   Although "appropriate occasions for sentencing juveniles to this harshest possible penalty will be uncommon," *Miller*, 132 S.Ct. at 2469, we cannot say, given the district court's findings, that the district court's decision to sentence Garcia to a life sentence "cannot be located within the range of permissible decisions," *Cavera*, 550 F.3d at 189 (quoting *Rigas*, 490 F.3d at 238). The district court carefully conducted the analysis required under *Miller* and we will not disturb its judgment.

*United States v. Garcia*, 666 F. App'x 74, 78 (2d Cir. 2016).

On December 4, 2017, Garcia moved to vacate, set aside, or correct his sentence pursuant to 18 U.S.C. § 2255. DE 63. The government opposed the § 2255 motion on April 19, 2018. DE 71. On September 6, 2018, Garcia submitted a reply in support of his position.[1] DE 81.

**Discussion**

---

[1] On September 21, 2020, *several years after filing his petition*, Garcia filed a motion to amend his filing to include supplemental grounds that can only be described as a "kitchen sink" filing. DE 81. The government opposes, arguing that such amendment is not only untimely but baseless and therefore futile. DE 87. As the Court is sensitive to the solicitude that must afforded to *pro se* filings, it has reviewed the proposed supplemental filing, and determined that many of the arguments are incomprehensible, while others are duplicative or entirely irrelevant. Simply by way of example, petitioner argues that because Judge Bianco did not advise him of the elements of Count Five of the indictment and he did not allocate to that homicide, such conduct was improperly considered as relevant conduct in the advisory Guidelines calculation. DE 81 at 21. This argument is fallacious, as the Guidelines permit consideration

*Standard of Review*

Section 2255 of Title 28, United States Code, allows federal prisoners to challenge the constitutionality of their sentences. This section provides, in pertinent part, that:

> A prisoner in custody under sentence of a court established by Act of Congress claiming the right to be released upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack, may move the court which imposed the sentence to vacate, set aside or correct the sentence.

28 U.S.C. § 2255(a). To qualify for relief under § 2255, the petitioner must demonstrate "a constitutional error, a lack of jurisdiction in the sentencing court, or an error of law or fact that constitutes 'a fundamental defect which inherently results in complete miscarriage of justice.'" *Graziano v. United States*, 83 F.3d 587, 590 (2d Cir. 1996) (quoting *United States v. Bokun*, 73 F.3d 8, 12 (2d Cir. 1995)).

Petitioner argues ineffective assistance of counsel. A petitioner claiming ineffective assistance of counsel "must show that (1) counsel's performance was objectively deficient, and (2) petitioner was actually prejudiced as a result." *Harrington v. United States*, 689 F.3d 124, 129 (2d Cir. 2012) (citing *Strickland v. Washington*, 466 U.S. at 687–88, 692–93 (1984)). The burden of showing ineffective assistance is "a heavy one because, at the first step of analysis, [a court] must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* (cleaned up).

"The determinative question at this step is not whether counsel 'deviated from best practices or most common custom,' but whether his 'representation amounted to incompetence

---

of conduct that is established by a preponderance, and do not require a plea to a specific offense. That precept is particularly applicable here, where the two homicides were intertwined and essentially simultaneous, and defendant admitted his involvement in the second homicide during his allocution. Therefore, the motion to amend is denied both procedurally and on the merits.

7

under prevailing professional norms.'" *Id.* at 129–30 (quoting *Harrington v. Richter*, 562 U.S. 86, 105 (2011)). The standard for evaluating the adequacy of counsel's representation is "a most deferential one," *Harrington*, 562 U.S. at 105, because "counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *United States v. Thomas*, 608 F.App'x. 36, 38 (2d Cir. 2015) (quoting *Strickland*, 466 U.S. at 690).

Should defendant clear this first hurdle by demonstrating ineffective performance by counsel, prevailing on a § 2255 petition then requires demonstrating actual prejudice from identified errors. *Harrington*, 689 F.3d at 129 (citing *Strickland*, 466 U.S. at 668, 687–88, 692–93). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. "[T]he question to be asked in assessing the prejudice from counsel's errors . . . is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." *Henry v. Poole*, 409 F.3d 48, 63-64 (2d Cir. 2005) (quoting *Strickland*, 466 U.S. at 695). "An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Lindstadt v. Kean*, 239 F.3d 191, 204 (2d Cir. 2001) (quoting *Strickland*, 466 U.S. at 691). Where, as here, defendant challenges sentencing, the prejudice prong mandates that petitioner show either that counsel's failings "suffice to undermine [ ] confidence in the outcome of [the] original sentencing," *Gonzalez v. United States*, 722 F.3d 118, 136 (2d Cir. 2013), or "would have changed . . . the sentence imposed," *Strickland*, 466 U.S. at 700.

*Analysis*

8

Defendant makes several arguments concerning alleged deficiencies in representation by his counsel which are of little moment. These include a claim that he was not provided with advice of his rights under the Vienna Convention for Consular notification, a claim that is demonstrably untrue. DE 71-1 at 31. Garcia further challenges the failure of his counsel to seek, and for the Government to proceed with a prosecution under the Juvenile Delinquency Act. However, it appears that, due to the period in which he became a fugitive, Garcia aged out of such treatment, and the Government properly notes that, even had he qualified for such prosecution, transfer to adult status would have been a certainty. *Id.* at 22-25. Next, Garcia claims that he was insufficiently advised as to the consequences of his guilty plea and potential sentencing. These claims are belied by the transcript of his plea proceedings as well as the plea agreement. Garcia also argues that his counsel failed to object to portions of the PSR and make certain arguments at sentencing, claims that are similarly contradicted by the factual record. Thus, as to each of these contentions, Garcia fails to establish that his counsel acted improperly or that he suffered any prejudice from the alleged errors.

Garcia only raises one ground of which one aspect bears discussion: his claim of a failure by counsel to raise arguments on appeal. In a footnote in its decision affirming Garcia's sentence, the Second Circuit noted, without elaboration, that "Garcia does not argue that *Montgomery v. Louisiana*, 577 U.S. 190, 136 S.Ct. 718, 193 L.Ed.2d 599 (2016) compels a different result." *Garcia*, 666 F. App'x at 78. In his reply, petitioner attempts to invoke *Montgomery*, claiming that counsel's failure to argue *Montgomery* rose to the level of ineffective assistance. DE 78 at 14. Of course, counsel vigorously argued that *Miller* required reversal, a proposition that the Court of Appeals roundly rejected. *Garcia*, 666 F. App'x at 78 ("Garcia argues that the district court should have given more weight to his youth and potential for

9

rehabilitation. The district court recognized that these were mitigating factors and discussed them extensively in light of *Miller*, but ultimately found that they were outweighed by other *Miller* and § 3553(a) factors.").

The *Montgomery* decision provided that:

> *Miller*, then, did more than require a sentencer to consider a juvenile offender's youth before imposing life without parole; it established that the penological justifications for life without parole collapse in light of "the distinctive attributes of youth." *Id.*, at ——, 132 S.Ct., at 2465. Even if a court considers a child's age before sentencing him or her to a lifetime in prison, that sentence still violates the Eighth Amendment for a child whose crime reflects "'unfortunate yet transient immaturity.'" *Id.*, at ——, 132 S.Ct., at 2469 (quoting *Roper*, 543 U.S., at 573, 125 S.Ct. 1183). Because *Miller* determined that sentencing a child to life without parole is excessive for all but "'the rare juvenile offender whose crime reflects irreparable corruption,'" 567 U.S., at ——, 132 S.Ct., at 2469 (quoting *Roper, supra,* at 573, 125 S.Ct. 1183), it rendered life without parole an unconstitutional penalty for "a class of defendants because of their status"—that is, juvenile offenders whose crimes reflect the transient immaturity of youth. *Penry*, 492 U.S., at 330, 109 S.Ct. 2934. As a result, *Miller* announced a substantive rule of constitutional law.

*Montgomery*, 577 U.S. at 208. And though the Court of Appeals noted Garcia's failure to argue that *Montgomery* would require a different result, the opinion seems to suggest that Judge Bianco's decision was fully consistent with the principles in *Montgomery*, quoting that decision in holding that the *Miller* "factors are intended to ensure that courts do not 'sentence a child whose crime reflects transient immaturity to life without parole.'" *Garcia*, 666 F. App'x at 78.

Judge Bianco's full and proper consideration of those factors would appear to satisfy the dictates of *Montgomery*. Moreover, the precepts contained in *Miller* and *Montgomery* may have been affected by the Supreme Court's decision in *Jones v. Mississippi*. 141 S. Ct. 1307, 1318–19 (2021) ("the Court has unequivocally stated that a separate factual finding of permanent incorrigibility is not required before a sentencer imposes a life-without-parole sentence on a murderer under 18."). Thus, Judge Bianco properly made determinations under *Miller*,

10

*Montgomery* would not have mandated a different result, and Garcia fails to posit a persuasive argument otherwise.

Furthermore, any concerns that could potentially arise under *Miller* and *Montgomery* have been further ameliorated by significant statutory and case law developments since the sentencing in this case. *Miller*, *Montgomery* and *Jones* all concerned mandatory life without parole sentencing provisions under the laws of various states. Federal sentences now present a slightly different situation. The Sentencing Reform Act of 1984 abolished parole in the federal system, yet Congress's enactment of the First Step Act of 2018 provides another safeguard against some of the concerns raised in *Miller* and *Montgomery*. For example, *Miller* noted that "incapacitation could not support a life-without-parole sentence [imposed against a minor]: Deciding that a juvenile offender forever will be a danger to society would require making a judgment that he is incorrigible—but incorrigibility is inconsistent with youth." *Miller v. Alabama*, 567 U.S. 460, 472–73 (2012) (cleaned up). "And for the same reason," the Court added, "rehabilitation could not justify that sentence. Life without parole 'forswears altogether the rehabilitative ideal' . . . It reflects 'an irrevocable judgment about [an offender's] value and place in society,' at odds with a child's capacity for change." *Id.*

These time-sensitive, predictive judgments can now be addressed through the First Step Act. As the Second Circuit has held, the First Step Act imbues a district court with the discretion to consider "the full slate of extraordinary and compelling reasons that an imprisoned person might bring before them in motions for compassionate release." *United States v. Brooker*, 976 F.3d 228, 237 (2d Cir. 2020). To be clear, under the statute, "[r]ehabilitation . . . alone shall not be considered an extraordinary and compelling reason" warranting a sentencing reduction. *Id.* at 238 (citing 28 U.S.C. § 994(t)). However, in applying the statute, the Second Circuit has ruled

11

that circumstances highly relevant to circumstances contemplated by *Miller*, as well as the facts set forth here, can be addressed under the Act:

> Zullo does not rely *solely* on his (apparently extensive) rehabilitation. Zullo's age at the time of his crime and the sentencing court's statements about the injustice of his lengthy sentence might perhaps weigh in favor of a sentence reduction. Indeed, Congress seemingly contemplated that courts might consider such circumstances when it passed the original compassionate release statute in 1984. *See* S. Rep. No. 98-225, at 55-56 (1984) (noting that reduction may be appropriate when "other extraordinary and compelling circumstances justify a reduction of an *unusually long* sentence" (emphasis added)); *see also United States v. Maumau*, No. 2:08-CR-00758-TC-11, 2020 WL 806121, at *6-*7 (D. Utah Feb. 18, 2020) (further discussing this history and collecting cases where district courts have reduced sentences in part because they were overly long).

*Id*. at 238.

Therefore, while federal sentencing remains a system without parole, the enactment of the First Step Act and the cases implementing the statute offer protections against some of the concerns identified in *Miller* and *Montgomery* and further supports denial of the petition.

**CONCLUSION**

Thus, the petition is denied in its entirety**.**

The Clerk of the Court is respectfully directed to close the case.

**SO ORDERED.**

Dated: July 6, 2023
Central Islip, New York

/s/ Gary R. Brown
HON. GARY R. BROWN
UNITED STATES DISTRICT JUDGE